Please get ready now for our next case, 3484, Inc. v. NLRB, numbers 24-9511 and 24-9525. Thank you, Your Honor. May it please the Court. I'm going to endeavor to save three minutes for rebuttal. The Board's order should be vacated for three reasons. One, it's not supported by substantial evidence. Two, the award of compensatory damages is in excess of the Board's statutory authority. And third, that remedy, along with the Board's process, violated petitioner's constitutional rights. I'd like to begin with the remedy question first because I think it's the most straightforward. As this Court previously held in Courts Lab and as the Third Circuit recently held in the Starbucks case, an award of compensatory damages beyond that which makes the employees whole is in excess of the Board's statutory authority. In Courts Lab, Courts Lab involved a pension fund and the Board ordered the employer to pay money into that pension fund, but it did not allow an offset for money already paid into it. And in Courts Lab, the Court held that that was beyond the Board's statutory authority. And for that reason, among others, we believe that the remedy question is properly before the Court. Why? How do you say that the issue was preserved? Two responses, Your Honor. And that's my question about why, that's what I meant when I said how is that properly before the Court? Yes, two responses. And I'm sorry, I did not hear you before. One is because we did preserve the objections. We cited to the ALJ's order and the specific lines. In Courts Lab, this Court held that similarly and admittedly terse objections were sufficient. And we think that conclusion is particularly apt in this case because the purpose of raising the objections beforehand is so the Board knows what issues are relevant. And the Board is well aware of the issues with respect to its award of compensatory damages. It continues to issue those awards. It is litigating the issue across the country, including on the Third Circuit. So there's no unfair surprise. There's no question about what issues. You have several arguments you make in your brief to this Court.  None of those arguments were expressed in the NLRB proceedings. All you did was identify something you objected to, but the rationale behind it. Ordinarily, that's necessary for preservation. You're saying it's not necessary to explain why you're objecting? Well, Courts Lab accepted similarly terse objections, and we believe that we've submitted the same. But again, the purpose of that requirement is so that the Board knows what the issues are. The issues we are raising here with respect to the remedies are the ones that the Board has addressed several times. There's no question about that. But an exception to that 10e requirement is when the Board exceeds a statutory authority. And again, in Courts Lab, this Court's already held that a similar award is in excess of the Board's authority. So under either rationale, we believe that the remedy question is clearly before the Court. Now, the Board's response is inconsistent. The Board says on the one hand that there's a lot of previous cases in which the courts have confirmed that the Board has the authority to issue these kinds of awards, which are public rights. But at the same time, the Board says that it is now allowed to award compensatory damages, although it is trying to run away from that description. But those are private remedies. An award of compensatory damages, consequential damages, are private remedies. And so the Board can't have it both ways. If it's public rights, it can order an injunction and a remedial order to make the employees whole. But it can't go beyond that without going into the private rights realm. But isn't that the key, the order to make the employee whole? Haven't we held that it's an equitable remedy and allows for things such as back pay? We're not contesting that back pay and similar items are part of the Board's make whole power. But what the Board did here and what it did in Thrive, the Board ordered Petitioner 3486 to make the drivers whole for any loss of earnings and other benefits, and for any other direct and foreseeable harms resulting from the unlawful practice. Which have not yet been determined, is that right? That's correct. They have not been determined. But at issue in the determination will be the make whole award and compensatory damages. Okay, so why wouldn't we then wait to see what happens? Let's say this order were to go into effect and then there's a determination as to what that means and whether the company has to make any financial payments in that sort of last category. And then the challenge becomes ripe. Well, it's ripe now, we believe, because at that hearing, the Board would be considering whether to award make whole and additional damages. We submit that it shouldn't. Yeah, but the Board could say, well, we don't think that's either within our power to do or we don't think that applies here and award zero. Well, the Board has already said multiple times that it is within its power to do this.  Yes, it is. It's said. It's awarded. It ordered Petitioner 3486 to make the employees whole and for any other direct or foreseeable harms. I guess what I'm getting at is this seems to me that it could at least be a fact determination as to whether any of those harms are worthy of compensation. But that determination hasn't been made yet. No, but this is when we need to raise these issues. I mean, the issues before the court needs to be addressed. This was also asked at the Third Circuit and the Third Circuit agreed that it was proper to raise them at this time. And I'd like to emphasize that the Supreme Court has held, and this is in the Russell case from 1958, that back pay is merely incidental to the Board's primary purpose, which is to eliminate and prevent obstructions to interstate commerce, and that the Board does not have the power to issue, did not set up a scheme to award these kinds of compensatory damages. Now, I would like to discuss the record to some extent. I believe that there are a number of inconsistencies in the record, beginning with the 3484 production. Now, that's the first production, and the problem there allegedly is a question by a supervisor to a driver about whether the driver was aware of any union activity. The ALJ, first of all, found that the two companies were not alter egos and were not a single employer. That conclusion has not been objected to by the Board. Yet, when the ALJ considered whether the supervisor, whether the question and the request to keep it confidential were coercive, the ALJ and the Board considered actions from the second production. And this Court has held, and the NLRB has held, that a single question and a single request for confidentiality do not necessarily show coercion. And so, by using evidence from the second production, we believe the Board, that the substantial evidence does not support that conclusion. Can you talk about the Kennedy case? I'm sorry? Kennedy, yes. And the NLRB case is Lafayette Park Hotel, where it said that a single request to keep things confidential is not necessarily coercive. We said it wasn't coercive. I'm sorry? I think our language was more definitive than not necessarily. It said it wasn't coercive. It said not all interrogations are illegal. And this one wasn't because it was just a single question. That's correct. What about the request or order to keep this quiet? Same response. One request does not necessarily make it coercive. But that's not required for the second violation. It's just, it doesn't have to be coercive. It's just any effort to keep things secret violates the NLRA. No, that's not correct. What's the language of that? The Lafayette Park Hotel, which is an NLRB decision from 1998, said that confidentiality requests are not necessarily coercive and therefore not necessarily violative of the act. Is a part of that analysis, though, whether there's a business justification for the confidentiality request? And if so, what was the justification here? Well, because of the timing of these things. The movie productions are, in these cases, are done over a matter of weeks. Things need to be done. If the business, if the movie production needs to hire additional drivers, it needs to know that in advance. And, again, it was just a simple question and request for confidentiality. Sure, but that may be why you would say it wasn't an interrogation. She just wants to know whether there's union activity. But saying, hey, don't share with anyone that I'm even asking these questions, that seems different to me. What's the justification for that specific order? I think it's the same thing. I'm just looking for information. Please keep it quiet. I'm just thinking about what the company needs to do in this situation. Evidence that it does not tend to be coercive is that this driver was hired for the second production. She voted to go on strike, and she went on strike. With respect to the second production, this involves the threat. Well, it doesn't have to be effective to be coercive. That's right. But I'm just saying the evidence in the record shows that she was not coerced. And so I don't think there's any other evidence that would tend to show coercion in this case. I'm checking your reply brief because I don't remember your responding to the NLRB's argument in its answer brief that there was still a problem with the request to keep things confidential. Did you respond to that in your reply brief? I thought we did, but I don't check here. Yeah, I will defer to the courts. With respect to the second production, again, this involves the threat, again, another alleged interrogation and the failure to reinstate. The threat, we think that there is sufficient evidence to show that the driving coordinator in that case did not have the kind of discretion that the board found. And as evidence of that, the ALJ, in a separate part of his opinion, said that the owner, Wolf, ran a top-down dictatorship. And that's in the record 817 and 818. I think that contradicts what the board concluded about the coordinator's ability to control things. Also, with respect to the equipment, I think that there were two big problems with the board's conclusion with respect to the stealing of the equipment. The board said, well, they knew, the union and the drivers knew that they had to take good care of the equipment. But that's irrelevant. The equipment was rented or owned by the movie companies or by Wolf or one of his other companies. And so the union and the drivers had no right to take it in the first place. It would be like if the movie companies had rented a building and the crew went on strike and occupied the building. They're not allowed to do it. On that, but doesn't it require individualized, you know, good faith or honest belief that specific individuals engage in certain conduct? And so my understanding is there are about 12 drivers and, you know, sort of all the equipment was taken. So is the inference that they all had to participate because it was taken, or did you anywhere in the record bring forward specific evidence by named driver? No, but the ALJ, again, this is the ALJ's. This is from record 831. The ALJ found that all nine drivers were entitled to reinstatement because they all engaged in picketing and they were all engaged in moving the vehicles and the equipment. So I don't think there's any question about which drivers. They were all involved. Not only did Wolf have an honest belief, he had to go to the hotel where the drivers were staying to recover his personal property. The property was stolen. There was no question about that. I see I'm only about two minutes left, and I'd like to reserve the rest for rebuttal. Thank you. Good morning. May it please the Court. Eric Weiss on behalf of the National Labor Relations Board. I'd like to begin on the Thrive remedy and in particular on the threshold jurisdictional question pursuant to Section 10e of the Act. This is a case where the employers did not raise any argument or present any of the arguments they're now making to the Board. What they did do in their exceptions document was to include rote exceptions to nearly every remedy. The exact quote in objecting to the Thrive remedy was that they were objecting based on the record and the supporting brief. If you then turn to the supporting brief, which we've lodged with the Court, they made no challenge to the Thrive remedy whatsoever. To the contrary, the brief was written as to suggest that what their argument was was that they were objecting to the unfair labor practice findings, and as a result, no order and no remedy was warranted. But at no point did they suggest that the Thrive remedy exceeded the Board's authority, that it violated the Seventh Amendment, that it was inconsistent with Section 10c of the Act, or any of the other broad arguments they now present. In Courts Lab, which opposing counsel has referenced, this Court distinguished the Supreme Court's opinion in the 7-up bottling case, noting that that was an example of a terse objection that was insufficient. And if the Court looks at what was at issue in 7-up, the language there was nearly identical to what occurred here. An employer had objected solely based on a rote recitation that the record and the law do not support this remedy, and the Supreme Court held that is insufficient to preserve an issue for the Board's consideration. In Courts Lab, this Court distinguished those facts. Those facts were very different. The Board had awarded a particular kind of relief unique to that case based on the facts. The employers specifically identified that they disagreed that that remedy was warranted, and in detail identified, you know, what they were objecting to. And although they didn't include, you know, extensive legal arguments, the Board was clearly on notice that the employer was objecting to it. This is even further removed or even more unjust to the Board than 7-up because in the supporting brief, not only did they not make arguments, they actually misled the Board into thinking that their objection was based on the ULPs and that no remedy was warranted. And so this is a straightforward case where the issue was not raised. As to the extraordinary circumstances exception, which this Court in Courts Lab noted in a footnote without actually applying, I'm not aware of any instance of this Court ever applying that exception, but some courts have looked to dicta from the Supreme Court's opinion in the Cheney-Lumber case to hold that in certain circumstances where the Board has clearly or patently traveled outside the orbit of its statutory authority, a court can deem that an extraordinary circumstance. But that is a very limited exception. I would point the Court to the Eighth Circuit's discussion of this in the Relco Locomotives case, which I think is very persuasive and illustrative, where the Eighth Circuit explained that there is this exception, but it is truly reserved for extraordinary circumstances where, for example, the Board clearly should have known that it was doing something beyond its authority, such as where you had in-circuit precedent that had already clearly foreclosed a certain type of Board action. The interpretation of that exception that the employers are now suggesting in their reply brief, which is any argument that alleges the Board exceeded its statutory authority is now an extraordinary circumstance, would swallow the rule and the intent of Congress in enacting Section 10e, because in most cases where a party is challenging a Board remedy, given the Board's broad remedial discretion, the argument is that the Board exceeded the discretion it has under Section 10c. In many cases, arguments that employers are raising to Board decisions are based on a claim that the Board somehow exceeded its discretion. And to say that in all of those cases, that is now an extraordinary circumstance, would run roughshod over Section 10e and would allow employers, as occurred in this case, to simply selectively and strategically not make any objections to the Board and then plan to litigate an issue in the first instance before a court of appeals, which is not what Congress intended in enacting Section 10e, which is a jurisdictional requirement, as this Court held in Public Service Company of New Mexico. And this is a classic case where the issue is not properly before the Court. Turning briefly just to the merits of the remedy, although, of course, our position is the Court has no reason to reach them, the opposing counsel mentioned Course Lab as supporting their position. I actually think it does the exact opposite. In Course Lab, this Court held that the Board had exceeded its authority because it had included a remedy that essentially, in the Court's view, allowed employees to collect twice to receive a windfall. And the Court's reasoning, which is consistent with 90 years of Supreme Court and Court of Appeals precedent, is that the objective of the act, the policy of the act, is to make employees whole and to restore the status quo ante. In Course Lab, this Court held that the Board's remedy had gone beyond that. But the remedy being challenged here, the Thrive remedy, is by its terms limited to making employees whole for concrete pecuniary harms that are fully litigated and proven in a compliance proceeding to have been caused by an unfair labor practice. It's a classic instance of restoring the status quo ante. As the Board explained in Thrive, this is not a new remedy. For 90 years, it has done this on an ad hoc basis. And the only innovation in Thrive was to say now, as a standard remedy, every time we include a MAKL order, we're going to use this particular language. But it was not expanding the Board's remedies into any form of private damages. It was not going beyond making employees whole or restoring the status quo ante. It is limited to the core remedial objective of the act, which the Supreme Court has recognized in those terms for 90 years. As for the Russell case, which employers are also relying on, again, I would just direct the Court to that case, which I would submit also supports the Board's position here. In that case, the Supreme Court was facing the question of, does the National Labor Relations Act supplant private rights of actions and tort claims in state law that employees might have? And the Supreme Court held no. The purpose of the National Labor Relations Act was to establish an agency to enforce the public rights enshrined in the act. It is not to provide damages to individual employees. It is not to adjudicate private rights. It is to determine what is necessary to further the policies of the act. And that's where the Supreme Court suggested in passing in dicta, or language that's essentially dicta, that the purpose of the Board is not to provide compensatory damages to employees. But in context, what the Court is getting at is that the Board is an agency that adjudicates public rights. That's what its remedies are aimed at effectuating, not private damages. And the question, which, again, the Supreme Court has held for 90 years, the standard of review, is when someone is challenging a Board remedy, is that remedy a patent attempt to achieve ends other than those that effectuate the policies of the act? The Supreme Court and lower courts have, on many occasions, struck down Board remedies, but it was based in situations where the Board had gone beyond restoring the status quo ante and beyond making employees whole. It had nothing to do with this common law equitable distinction that the employer is attempting to insert into Section 10C of the act, although on that point, I'd like to be clear that the remedy here is properly deemed equitable. We are not claiming that under Section 10C the Board necessarily has the authority to issue legal damages or any kind of legal remedy. Our objection as to that statutory argument is simply that is not the test under Section 10C. In Board cases, the courts do not need to determine on a case-by-case basis, is this something a court of equity did in the 18th century? Rather, the Supreme Court has already held the question is, is it something that goes beyond effectuating the policies of the act? And I would submit that the Thrive remedy... To finish briefly, I'd like to get to whether there were any violations. Sure. I'll just finish briefly noting that I would submit the Thrive remedy is clearly within the core of the Board's policy objective, which is to restore the status quo ante. Could we turn to the unfair labor practice? Please, Your Honor. Sure. So let me focus first on 3484, the first. How did the question about whether there was union activity, how did that differ from the question in Kennedy? It looks to me like Kennedy controls. Maybe Kennedy was wrong, but it's controlling. Can you reconcile the determination that that question was an unfair labor practice with Kennedy? Sure, Your Honor. Well, I'd preface my answer by noting that this area of law, the question of unlawful interrogation, is a totality of circumstances test. It's a case-by-case, fact-specific analysis, so the Board has to weigh different facts on each case. In Kennedy, this Court denied enforcement of the Board's unfair labor practice finding in a very terse opinion. I believe it's essentially one sentence in that opinion. So not all of the contours, the factual framework of that case, are necessarily explained. But doesn't that mean that it found just the fact that it was just that one question won't do it? It seems to me that it's stronger because it didn't worry about other potential factors. So that one question is not going to coerce anybody. Well, I don't know that the Court wasn't worrying about it. I think they were reviewing all of the detailed facts of that case, and in their opinion, they didn't get into them. Sometimes that means the facts they recite in their reasoning are all the facts they consider relevant to the determination, and that's the precedent that was set there. Sure, Your Honor, but I don't think Kennedy can be read as a per se rule that any time you have a single question that that can't be an interrogation. In the YMCA case, for example, another decision from this Court, again, those facts differ in certain ways, but that was a situation where you had a single instance of questioning about the Union. Single incidence of questioning, but it was more than one question, wasn't it? Yes, Your Honor, although I... The one question that was referenced in Kennedy, I find hard to distinguish from the one question here. Well, Your Honor, I think the distinction, for example, is that the circumstances of the question here were very different. You had a situation here where the highest level supervisor in charge of day-to-day production singled out a low-level employee, called them after hours on their personal cell phone in a sort of surreptitious way, which is similar to situations this Court has found supports coercion, such as locking a door or contacting an employee after work. It suggested that this was somehow some kind of surreptitious inquiry or needed to be kept under wraps. It came in the context, again, which I think is important in this case, of a course of conduct over several weeks involving all of the same individuals, David Wolf, film productions, Ms. Ricci, the same manager, the same drivers. Granted, it was across two different film productions, but it occurred in very short order. Well, Counselor, can you help me understand on the record? Because I don't make films and hire a lot of labor to assist with that, but it seems to me that that's an extensive project. It requires a lot of time, planning, and resources. And here, my understanding is the drivers were going to be needed for a relatively short time frame, for 15 days. But yet, on the 3486 shoot, they approach Mr. Wolf basically on the eve of shooting the film, and it seems very tactical on their part to come at him at a time where his attention is going to be elsewhere. So I guess looking at the record, then, as we're looking at a number of these determinations for substantial evidence, how does that factor in? If we're trying to determine what motivated their strike, for example, they say, well, it was a ULP strike, but it seems also pretty clear that it was an economic strike and they were using the ULP as leverage. And how much credibility can we give to them when we look at the record and, again, what I call a tactical advantage they were trying to gain with the timing of all this? Well, I think the timing points in both directions, Your Honor, because just to briefly go through the timeline here, it's true that the union approached Wolf Productions on the eve of filming, and Mr. Wolf may have a valid objection to that. That is not the basis for the board's order. What is the basis for the board's order is after the union did so, and he was upset by it, his deputized agent threatened the employees that if they continued with these attempts to organize, production was going to move to Canada. That occurred immediately after they reached out to him, and soon after that. Is that a hollow threat? I mean, they're all on set. They're ready to shoot. Well, it's not a hollow. I'm supposed to read the record to kind of have an understanding of that. At least it is for me. I think a relevant consideration, Your Honor, is that all of the parties here are repeat players. So when that threat is made, that Hallmark Productions, the client who is a recurring client of Mr. Wolf, these drivers recurrently work on these same film productions in Utah, that if they try to organize, all of film production is going to move to Canada. That is clearly a threat to their continued livelihood as film industry drivers in Utah. And I don't think it's a hollow threat at all. I think it's one of the most coercive threats you can make to an employee. And so it's true that they reached out to him on the eve of filming. Whether that's good manners or legitimate or not is not really relevant. What's relevant is that in response, this Hallmark unfair labor practice was committed, and all of the record evidence shows that, at least in part, in response to that unfair labor practice, the employees chose to go out and strike to protest, with the hope being that Mr. Wolf would stop threatening them and he would recognize them and negotiate a contract. That's obviously their long-term goal, just like any employees who are trying to unionize. But it's a very lenient test. Was an unfair labor practice at least part of the motivation? And I see that I'm over time, so unless there's any... Sure, Your Honor. What about the argument made by the employer in its first argument regarding the evidence of misconduct in damaging the equipment of the company and how that could justify what the company did? How do you respond to those arguments? Well, I think there's two sort of intertwined arguments. Before the board, the employer argued that employees had actually vandalized equipment and intentionally damaged it. The board held or found that there was no evidence whatsoever, number one, that particular employees did so, or number two, that the employer even believed that it had anything to do with the strike. And on review, I don't read the employer's briefs as pursuing that argument. There's one stray reference to equipment damage. They do not contest that finding by the board. On review, they make a different argument, which is that the employees should be denied reinstatement because they moved some of the leased vehicles. That was not preserved, you don't think, before the board? I think it's debatable, Your Honor. We haven't pressed the Section 10e argument as to that, but clearly that was not the main argument they were presenting to the board, whether they incidentally preserved it, maybe. But I think it's not a compelling argument because the test here under clear pine moldings and this course precedent applying clear pine moldings is that employees have to have engaged in serious misconduct that actually coerces dissenting employees who want to cross the picket line. So traditionally that is picket line violence. It could include property damage, but it's not simply being disobedient to the employer. And what happened here is not even really misconduct because the employers are alleging that this was somehow theft or interference with their property rights. But I would emphasize, number one, that the employees and the union actually contacted all of the property owners. They did not move any of the several vehicles owned by David Wolf. As for the leased vehicles, they contacted the actual owners to make sure that those owners wanted the vehicles moved to safety and they received consent. And in addition, while all of this was going on, all of the managers and supervisors for Wolf Productions were on site and they tacitly signed off on it, or at a minimum they did not object. They watched it going on and they said, do what you need to do. And there was no attempt to prevent the employees from doing this, which again was entirely in good faith to prevent damage to the vehicles. Thank you. Any other questions? All right. Thank you. And we'll give Appellant some extra time. Give him six minutes. Thank you. Your Honor, with respect to the last point about the union members and the employees calling the owners of the equipment, again, if the movie company had rented a building and the crew went on strike and took control of the building and they called the owner and said, do you mind if we take control of the building, it's irrelevant. The equipment and the trucks were in the lawful possession of Wolf. They were stolen. There's no question about it. The union can't change that by getting consent from the party that leased them. They no longer had physical control or legal title to those, to the equipment and trucks while that was going on. With respect to the arguments about public rights, in jarcossy the Supreme Court clarified what public rights were. There was a specific list of things like immigration, public lands. It did not include NLRB actions. So we believe that the public rights analysis does not support the Board's decision here. Further, my friend is correct that the courts have held in certain circumstances that, or they have overruled what the Board has done in terms of exceeding its statutory authority by awarding things that do more than make the employees whole. But that's the crux. The point is to restore the status quo ante. Damages beyond that are separate and beyond the Board's authority. And again, I'd reiterate, the Board's order here says that the employer must make the employees whole and award relief for direct and foreseeable harms. Those are consequential damages. And that is beyond the Board's power. Course Lab, again, held that the Board exceeded its statutory authority by requiring money to be put in a pension fund beyond that which had already been deposited. So the same thing here. If the court agrees that there are UOPs and if the court agrees that a make whole order makes sense, that's fine. But damages, we believe, are beyond the Board's authority. You don't have to use all the time I gave you. No, I understand. I just want to make sure I've got everything. I'd like to make one point about the threat. There's no evidence in the record, and this goes to Judge Federico's question about the nature of the threat and whether the strike was UOP or economic. There's no evidence in the record that the drivers, other than Brewer, knew about the threat. The record shows that the union members discussed, said to the drivers there had been UOPs. But that's it. The record doesn't say what the nature of the UOPs were, whether the drivers were aware of anything. So we think that's also, the court should take that into consideration. Can you actually help me understand, again, just the record? Three days before the shoot, they come to Mr. Wolf with an email and say, we'd like to talk about a new contract. Again, I frame that as being, I think, maybe tactical. At least you could read the record that way. But also, they're asking for things like health benefits and retirement, but this is such a short time frame. Can you help me understand how that works in practice? Let's say they sign the contract. Would that carry on to the next project, or is that paid by the union? No, that would just be for each individual production. That's how the practice in the industry is that each film gets its own entity. So the contract would be between the union and the specific entity. And that would carry on to the next project? It would not. It would not? It would not. It would just be for that particular shoot. Now, I suppose they could agree to it, but I think the standard is they want to keep everything lined up so that any issues with a particular film won't affect a future production. And one last point on that. There is an email from the union representative after the ULP allegedly was committed, and she sends an email to Wolf and it said, all this is about is getting a contract for the workers. This is nothing more than an effort to get a contract for the workers. We submit this was an economic strike. And if there are no other questions, thank the court for its time. Thank you, counsel. Case is submitted. Counsel are excused.